**IN THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In Re:

ERNIE HAIRE FORD, INC., d/b/a BIG DOG             Case No. 8:08-bk-18672- MGW
MOTORCYCLES OF TAMPA, d/b/a ERNIE
HAIRE MEGAVOLUME SUPERSTORE,                       Chapter 11
d/b/a ERNIE HAIRE USED CAR AUTO MALL,
d/b/a ERNIE HAIRE USED CAR SUPERCENTER
OF TAMPA, d/b/a QUICKLANE TIRE & AUTO
CENTER,

      Debtor.

_____/  Adv. Proc. No.: _____

WILLIAM M. ROBERTS as Liquidating Agent for
ERNIE HAIRE FORD, INC., d/b/a BIG DOG
MOTORCYCLES OF TAMPA, d/b/a ERNIE HAIRE
MEGAVOLUME SUPERSTORE, d/b/a ERNIE HAIRE
USED CAR AUTO MALL, d/b/a ERNIE HAIRE
USED CAR SUPERCENTER OF TAMPA, d/b/a
QUICKLANE TIRE & AUTO CENTER,

      Plaintiff,

vs.

ADESA       FLORIDA,    LLC,    a/k/a    ADESA
CORPORATION,    a/k/a,    ADESA    AUCTIONS;
BENJAMIN A. ATKINSON; CARROLLWOOD AUTO
REPAIR & SALES, INC.; GARY BURNS AUTO
SALES, INC.; K & C AUTOMOTIVE, INC.; ALLEN
MEDGEBOW, d/b/a MEDGEBOW ENTERPRISES;
MARIE      SAMANTHA     MURPHY;       BARRIE
WHOLESALERS, INC., d/b/a MOTOR CITY; and
PRECISION NISSAN, INC.,

      Defendants.

_____/

**<ins>VERIFIED COMPLAINT</ins>**

      Plaintiff, William M. Roberts as Liquidating Agent (the **"Liquidating Agent"**)

for Ernie Haire Ford, Inc. (**"EHF"**), files this *Verified Complaint* (the **"Complaint"**)

against the above-captioned Defendants and in support thereof respectfully represents to the Court as follows:

## I.  Nature of Adversary Proceeding

1.     This is an adversary proceeding seeking compensatory damages and certain equitable relief against the Defendants arising from their improper and illegal actions taken in connection with the so-called "short sale" of certain used vehicles belonging to EHF through the Auction UVKS, as defined below, between October 1999, and the Petition Date, as defined below (the "**Relevant Period**").

2.     These actions, described below, resulted directly in substantial harm to EHF, the precise extent of which has yet to be determined.  EHF's secretary and treasurer Geoffrey Todd Hodges (**"Hodges"**) estimates the scope of this harm to be well in excess of one million dollars ($1,000,000.00).

3.      On account of this as-yet unliquidated harm suffered by EHF, Plaintiff is seeking damages and certain equitable relief through this adversary proceeding.

4.     This Complaint is timely filed pursuant to the terms of this Court's *Order Continuing Pretrial Conference and Setting Deadline to File Amended Adversary Complaint* entered on May 13, 2011,  [Adv. Doc. # 94] and this Court's *Order Granting Motions to Dismiss and Memorandum Opinion on Joinder and Pleading Requirements* entered on November 2, 2011 [Adv. Doc. # 198].   The *Liquidating Agent's Motion for Application of Equitable Tolling Doctrine* will be filed shortly after this Complaint.

## II.  Jurisdiction and Venue

5.    This Court has original subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and (e) and §§ 157(a) and (b)(2)(A), (B), (E), (H), and (O) and pursuant to the standing order of reference to bankruptcy judges entered by the Chief District Court Judge for the Middle District of Florida on July 11, 1984 (*In re: Assignment of Cases Arising Under Title 11, United States Code*, No. 84-MISC-152 (M.D. Fla. 1984)).    This adversary proceeding is a "core" proceeding under 28 USC § 157(b)(2).

6.    This adversary proceeding has been brought in connection with the Chapter 11 Bankruptcy Case of Ernie Haire Ford, Inc., Case Number 08-bk-18672-MGW, which is currently pending before this Court.   Venue for this adversary proceeding is appropriate pursuant to, *inter alia.*, Section 7.9 of the *Debtor's Second Amended and Restated Chapter 11 Plan* [Bankruptcy Case Docket No. 699] (the "Plan") and ordered paragraphs 8, 21, and 24 of the *Order Approving Disclosure Statement and Confirming Debtor's Second Amended Plan* [Bankruptcy Case Docket No. 743] (the "Confirmation Order").

7.    Defendants are subject to the personal jurisdiction of this Court pursuant to Federal Rule of Bankruptcy Procedure 7004(f).   In addition, Defendant Benjamin Atkinson has filed proofs of claim in the EHF Bankruptcy Case.   [Claim Nos. 111-1, 111-2, and 111-3]

## III.  Parties

8.    Plaintiff, William M. Roberts, was appointed Liquidating Agent for EHF by operation of ordered paragraph 8 of the Confirmation Order and commenced this

Adversary Proceeding pursuant to the powers granted to him in ordered paragraph 24 of the Confirmation Order.

9.      Defendant Benjamin A. Atkinson ("**Atkinson**") is an individual residing within Hillsborough County, Florida, who has filed claims in the Bankruptcy Case. [Claim Nos. 111-1 and 111-2]   From October 1999, until his employment was terminated in June 2005, Atkinson was EHF's wholesale manager for used vehicles. Atkinson also acted as an agent for Cars Inc., as defined below, from 2002 through 2008.  As set forth in greater detail below, Atkinson orchestrated the vast majority of the transactions that are the subject of this Complaint.

10.      Defendant Marie Samantha Murphy ("**Murphy**") is an individual residing within Orange County, Florida.  From October 2002, until her employment was terminated in August 2004, Murphy was Atkinson's personal assistant and a full-time employee of EHF.

11.      Atkinson and Murphy shall be referred to collectively in this Complaint as the "**EHF Defendants**."

12.      Defendant Gary Burns Auto Sales, Inc. ("**Burns Auto**") was a Florida for-profit corporation that did business with EHF from 1999 to 2005.  Burns Auto was administratively dissolved by the Florida Department of State in 2006.  As discussed in greater detail below, Burns Auto also conducted business under the name Hillsborough County Auto Auction.  Burns Auto's principal place of business is listed with the Florida Department of State as having been located at 2909 North 40th Street, Tampa, Florida.

13.      Defendant Carrollwood Auto Repair & Sales, Inc. ("**Carrollwood**") is a Florida for-profit corporation that conducted business with EHF from 1999 to 2008.

Carrollwood's principal place of business is listed by the Florida Department of State as being located at 14441 North Florida Avenue, Tampa, Florida 33613.

14.    Defendant Precision Nissan, Inc. doing business as Courtesy Nissan of Tampa (**"Courtesy"**) is a Florida for-profit corporation that did business with EHF from 2002 to 2005.  Courtesy's principal place of business is listed by the Florida Department of State as being located at 2905 Premiere Parkway, Suite 300, Duluth, Georgia, 30097, but Courtesy conducted business in Hillsborough County, Florida, during the Relevant Period.

15.    Defendant K & C Automotive, Inc. (**"K & C"**) was a Florida for-profit corporation that did business with EHF from 2002 to 2003.  K & C was administratively dissolved by the Florida Department of State in 2004.  K & C's principal place of business is listed by the Florida Department of State as having been located at 5402 W. Laurel Street, Florida 33607.

16.    Defendant Allen Medgebow doing business as Medgebow Enterprises (**"Medgebow"**) is an individual residing within Hillsborough County, Florida.  From 2000 until 2004, Medgebow conducted business with EHF.  Medgebow's address is listed with the Florida Department of State as 5700 Mariner Drive, Apt. 206, Tampa, Florida 33609.

17.    Defendant Barrie Wholesalers, Inc. doing business as Motor City (**"Motor City"**) was a Florida for-profit corporation that purchased vehicles from EHF from 2002 through 2004. Motor City was voluntarily dissolved by the Florida Department of State in 2008.  Motor City's principal place of business is listed by the Florida Department of State as having been located at 1386 Saratoga Street, Deland, Florida 32724.

18.     The foregoing defendants, with the exception of the EHF Defendants, shall be referred to collectively in this Complaint as the "**Wholesaler Defendants**."

19.     Though not a defendant in this lawsuit, Cars, Inc. of Tampa Bay ("**Cars Inc.**") acted as a wholesaler of EHF vehicles from 2001 to 2007.  Atkinson purchased vehicles as an agent for Cars Inc. and possibly others from 2002 to 2006.

20.     Defendant Burns Auto conducted certain business under the name Hillsborough Auto Auction and under the name Hillsborough County Auto Auction. In addition to acting as a wholesaler of vehicles originating with EHF, Burns Auto also purported to act as an auction company for the disposition of EHF vehicles.  In this context, Burns Auto will be referred to herein as "**Hillsborough County Auto Auction**," the name under which it conducted some or all of this business, or simply as "**HCAA**."  HCAA's principal place of business is located at 2909 North 40th Street, Tampa, Florida.

21.     Defendant Adesa Florida, LLC (successor by merger to Adesa Florida, Inc.), also known as Adesa Corporation and Adesa Auctions, ("**Adesa**") is a Florida for-profit limited liability corporation that conducts vehicle auctions in the State of Florida.  Adesa's principal place of business is located at 3225 North 50th Street, Tampa, Florida 33619.

22.     Defendants HCAA and Adesa shall be referred to collectively in this Complaint as the "**Auction Defendants**."

## IV.  General Allegations

Background Information

23.     During the Relevant Period, EHF acted as a Ford-franchised new car dealership.  It also acted as a used car dealer throughout its existence both at its main dealership location and through several other affiliated or wholly owned used car dealerships.

24.     EHF commenced business in Tampa in the 1950s under the name of Koons Northgate Ford.  In 1970, Ernest B. Haire, Jr., incorporated the corporation in its current form in the State of Florida.

25.     The majority of EHF's used vehicle business grew out of the trade-in vehicles that it acquired in connection with its new car and new truck business.  If these trade-ins were relatively new, in good condition, and had only relatively low mileage, EHF would attempt to sell them on its own used car lot or at one of its affiliated used car lots.  Selling used vehicles on its own used vehicle lots, and those of its affiliates, was the most profitable means for EHF to dispose of its used car inventory.

26.     EHF sold the remaining trade-in vehicles, i.e., those which were older or not in sufficiently good condition, as well as those which EHF could not sell within 45 to 60 days on its own used car lots, through independent dealers or through commercial auction houses.

27.     Since no later than 1985, EHF's senior management has maintained and attempted to enforce a policy that strictly controlled how and to whom this second category of trade-in vehicles was sold (the **"Wholesale Policy"**). Specifically, this policy required that the less desirable trade-in vehicles described above be sold either (1) through an established commercial vehicle auction (the

preferred method) or (2) through arms-length transactions with other franchised new car dealerships or (3) through arms-length transactions with a small number of pre-approved used vehicle wholesalers. These approved wholesalers were identified on a list (the **"Approved Wholesaler List"**) created and updated by EHF's senior management and maintained by EHF's accounting department.

28.    EHF's policy regarding the disposition of less desirable trade-in vehicles remained in force throughout the Relevant Period.

29.    In 1999, EHF hired Gregory Balasco ("**Balasco**") to act as the General Manager for EHF and certain of its affiliated automobile dealerships.

30.    During the latter part of the same year, EHF's management decided to consolidate the dealership's purchasing and sales activities relating to used vehicles into a separate and distinct wholesale department that would be overseen by a single manager. It was anticipated that this decision would improve the profitability of the dealership's used vehicle business by imposing uniform procedures and requirements on all of the dealership's used vehicle salespeople and managers.

31.    In October 1999, at the suggestion of Balasco, EHF hired Atkinson to act as the initial manager of EHF's newly independent wholesale department. The total compensation that Atkinson received from EHF varied from year-to-year up to a maximum of approximately $250,000 in 2004.

32.    Atkinson's duties in this position included purchasing used vehicles from automobile auctions for EHF to sell on its used vehicle lots, purchasing used vehicles from franchised new car automobile dealers for EHF to sell on its lots, establishing the values of the used vehicles that EHF received as trade-ins in connection with its new car business, deciding which trade-in vehicles were

appropriate for retention by EHF to be sold on its used vehicle lot, deciding which trade-in vehicles were unfit for sale on EHF's used vehicle lots, and disposing of the unfit vehicles in accordance with the Wholesale Policy to obtain the best possible prices.

33.     As EHF's Wholesale Manager, Atkinson functioned as an officer, although not a statutory officer, of the company and occupied a position of trust and confidence.  He owed fiduciary duties of loyalty and fidelity to EHF because he, perhaps as much as any single EHF employee, could positively or adversely affect EHF's financial well-being due to the volume of vehicles under his direct control.

34.     In early 2002 while employed by EHF as its wholesale manager, Atkinson became an independent contractor for Cars Inc.

35.     During Atkinson's affiliation with Cars Inc., Cars Inc. paid him over $250,000 in "commissions" from transactions related to the used vehicles which Cars Inc., through Atkinson, had purchased from EHF and which flowed through the UVKS, as defined below.

36.     Upon information and belief, Atkinson had similar arrangements with other Wholesaler Defendants and other used vehicle dealers through which he was paid additional "commissions" at the expense of EHF.

37.     Atkinson never disclosed his relationship with Cars Inc. or any of the other Wholesaler Defendants to EHF's senior management and never sought or received permission from EHF to become an agent for Cars Inc. or any of the other Wholesaler Defendants despite the inherent conflict of interest created by those relationships in light of his continuing employment as EHF's wholesale manager.

38.   Cars Inc. operated as a wholesale broker of used vehicles.   Its independent contractors would cause Cars Inc. to purchase used vehicles from an auction house or from a dealership for resale.

39.   Cars Inc. funded these purchases, collected the proceeds of the re-sales, performed the relevant title services, and kept the records for each of these vehicle transactions; for these services, Cars Inc. charged each independent contractor a fee.   Cars Inc. charged Atkinson a fee of $125.00 per vehicle.

40.   If a vehicle sale generated a loss, the independent contractor had to reimburse Cars Inc. for the amount of that loss and to pay the $125.00 fee. If a vehicle was sold for a profit, Cars Inc. paid the profit (less its $125.00 fee) to the independent contractor.

41.   Beginning in February 2002, Atkinson commenced "selling" EHF's vehicles to Cars Inc., and then reselling them through Cars Inc. to other wholesale buyers and to retail vehicle sellers for substantial profits.

42.   In October 2002, EHF hired Murphy to act as Atkinson's personal assistant.   In this capacity, Murphy had access to all of the financial and title information maintained by EHF's wholesale department.

43.   During the early 2000's, EHF steadily grew as a dealership.   Indeed, EHF sold 3,834 new vehicles in 2004.   These new car sales alone generated gross proceeds of over one hundred million dollars ($100,000,000) in 2004.

44.   As previously noted, EHF was also involved in buying and selling used cars throughout its existence.

45.   In connection with most of its new car sales, EHF acquired trade-in vehicles.   To a lesser extent, EHF also purchased used vehicles at wholesale

auctions for re-sale on EHF's used vehicle lot or through one of its corporate affiliate dealerships.

46.   In 2004, EHF sold 4,298 used vehicles which generated gross used car sales in excess of eighty million dollars ($80,000,000).  Accordingly, EHF's trade-in used cars accounted for a substantial portion of its overall business; in most years EHF sold more used vehicles than new vehicles.

47.   In late 2002, EHF's senior management became aware of certain improper and fraudulent conduct on the part of Atkinson toward EHF.

48.   Specifically, in late 2002, the purchaser of a used vehicle from EHF threatened EHF's senior management with a lawsuit.  EHF sold the relevant vehicle with a standard used vehicle title.  In fact, the vehicle had been submerged in a flood and should have been sold with a branded title identifying the vehicle as having been substantially damaged in a flood.  EHF obtained the vehicle and the "clean" title from Atkinson who had fraudulently "washed" the title to remove the branding.  EHF was forced to settle the threatened lawsuit for substantially more than the vehicle at issue was worth.

49.   Later, in December, 2003, EHF became aware that Atkinson had been appropriating EHF's used car inventory and "lending" such vehicles to his friends and family when one such vehicle was involved in an accident.  The dealership was contacted by a customer who advised EHF that the vehicle that the customer had recently traded-in had been in an accident and that the driver of that vehicle had been uninsured.  Until that telephone call, EHF's senior management believed the accident vehicle to have been consistently located on its used car lot.  Subsequent

investigation revealed that Atkinson had improperly removed the accident vehicle from EHF's premises and "loaned" it to a friend.

50.     Faced with this type of improper conduct on the part of Atkinson, EHF's senior management decided that Atkinson's employment with EHF should be terminated.

51.     Omar Maiwandi ("**Maiwandi**") was hired on October 18, 2004, to replace Atkinson as the manager of EHF's wholesale department.  During the seven months between Maiwandi's hiring date and Atkinson's termination date, Maiwandi was trained to replace Atkinson as the head of EHF's wholesale department.

52.     In conformity with the decision that it had reached in 2004, EHF's senior management finally terminated Atkinson in mid-2005 for committing fraud on EHF in connection with the sale of his own used vehicle to EHF and for improperly using company property for his personal use and that of his friends. The fraudulent conduct underlying this Complaint is separate and distinct from Atkinson's fraudulent conduct that resulted in his termination by EHF.  EHF had previously terminated Murphy in 2004.

53.     Both Atkinson and Maiwandi reported directly to Balasco and were directly supervised by Balasco in his capacity as EHF's general manager.

54.     Beginning in 2007, EHF's business fortunes began to flag for a variety of reasons including the general downturn in the regional economy.  By late 2008, the financial condition of EHF had deteriorated to such a degree that its senior management decided to file for bankruptcy protection.

55.     From the time of Atkinson's firing in June 2005, through the date that EHF filed for bankruptcy protection, EHF's senior management never learned of the

UVKS, as defined below.   That information began to be developed by the Liquidating Agent in preparation for commencing this proceeding and other similar proceedings; the process of gathering the relevant information is ongoing.

56.    On November 24, 2008 (the **"Petition Date"**), EHF filed for protection under the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*. (the **"Bankruptcy Code"**).

57.    Throughout the Relevant Period, the vast majority of the wholesale deal files created and maintained by EHF were grossly incomplete.   As maintained by EHF, a **deal file** consisted of a manila folder that contained all pertinent paperwork relating to EHF's purchase or sale of a specific vehicle.

58.    Interestingly, EHF's retail deal files did not suffer from the same gross deficiencies as the wholesale deal files despite the fact that the total number of wholesale and retail deal files maintained by EHF were roughly the same during the Relevant Period.   This was true despite the fact that retail deal files are more voluminous and more difficult to maintain than wholesale deal files.

59.    The retail deal files did not play the same critical role in the Used Vehicle Kickback Scheme, as defined below, as the wholesale deal files did.

Overview of The Used Vehicle Kickback Scheme

60.    Balasco's duties as EHF's general manager included oversight and control responsibility for the daily operations of EHF's dealerships.

61.    Specifically, Atkinson and Maiwandi, under Balasco's supervision, were in charge of the disposition of that portion of EHF's used car inventory that was sold at wholesale as opposed to that portion that was retained by EHF to be resold on its own used car lots to retail customers.

62.    The decisions as to which used vehicles would be wholesaled and which would be resold on EHF's own used vehicle lots were made by the company's wholesale managers, Atkinson and Maiwandi.

63.    During the Relevant Period, Atkinson and Maiwandi were the company's only full-time wholesale managers.

64.    Pursuant to the Wholesale Policy, used car inventory that remained on EHF's lots for longer than 45 to 60 days was to have been removed from EHF's lots and either sold at auction, sold to an approved third party wholesaler, or sold to another franchised new car dealership.

65.    Pursuant to the Wholesale Policy, Atkinson and Maiwandi were to enter into wholesale vehicle sales transactions on behalf of EHF only with franchise new car dealerships, commercial automobile auction houses, or a small number of specifically identified and preapproved used vehicle dealers and wholesalers.

66.    None of the Wholesale Defendants were approved wholesalers or approved used vehicle dealers under the Wholesale Policy; accordingly, none appeared on the Approved Wholesaler List.

67.    Atkinson and Maiwandi aware of the Wholesale Policy and periodically received updated copies of the Approved Wholesaler List from EHF's senior management.

68.    Neither Atkinson, Maiwandi, Murphy, nor even Balasco had the authority to modify the Approved Wholesaler List in any way.

69.    EHF's senior management maintained the Wholesale Policy and the Approved Wholesaler List to minimize the possibility that EHF employees could personally profit from the sale of EHF used vehicles to unscrupulous resellers willing

to pay "kickbacks" to such employees for providing them with "sweetheart" deals on such used vehicles, i.e., selling the unscrupulous resellers such vehicles at below regular wholesale market prices - a practice known in the automotive industry as "short selling."

70.     During the Relevant Period, the EHF Defendants had access to and, in the case of Atkinson, control over all of the financial books and records of EHF's wholesale department.

71.     Murphy provided substantial aid and assistance in structuring and maintaining the Auction UVKS.  Indeed, it appears that Murphy was almost single-handedly in charge of preparing or supervising the preparation of virtually all of the documentation originating in EHF's wholesale department that Atkinson provided to EHF in connection with each Auction UVKS transaction.

72.     During Atkinson's term as EHF's Wholesale Manager, Atkinson knowingly and systematically sold hundreds of used vehicles to used car dealerships (including, but by no means limited to, the Wholesaler Defendants) that were not on the Approved Wholesaler List.  The EHF Defendants never made EHF's senior management aware of this practice.

73.     This practice was knowingly undertaken by Atkinson with the specific purpose of defrauding EHF and was thus undertaken with felonious intent and with the actual intent to hinder, delay, and defraud EHF and its creditors.

74.     While acting as EHF's wholesale manager, Atkinson knowingly arranged for some or all of the used vehicles sold to used car dealerships that were not on the Approved Wholesaler List to be serviced in EHF's service facility for free

prior to their sale.  This practice violated EHF's internal policies as they related to vehicle service and used vehicle sales.

75.    This free servicing of certain used vehicles was never reported to or approved by EHF's senior management and resulted in financial injury to EHF separate and apart from that suffered on account of the short selling practices described herein.

76.    During the term of his employment with EHF, Atkinson consistently concealed from EHF's senior management the fact that he knowingly approved and often orchestrated the sale of hundreds of EHF used vehicles to used car dealerships and other entities and people which were not listed on the Approved Wholesaler List.  Atkinson profited personally from these secret transactions at the expense of his employer, EHF.

77.    Atkinson and, upon information and belief Murphy, profited personally from the disposition of EHF used vehicle inventory to entities which were not on the Approved Wholesaler List by personally retaining a portion of the sale proceeds which should have been remitted to EHF, their employer.  This systematic practice of defrauding EHF through unauthorized short sales of certain portions of EHF's used vehicle inventory is referred to herein as the **"Used Vehicle Kickback Scheme."**

78.    To date, Hodges and his staff at EHF have reviewed over thirteen thousand (13,000) of EHF's used vehicle deal files.  This review indicates that a significant portion of the vehicles represented by these deal files was sold improperly through the Used Vehicle Kickback Scheme.  The transactions that are

the subject of this Complaint are a subset of the vehicles improperly sold through the overall Used Vehicle Kickback Scheme.

79.    A comparison of the sale proceeds received by EHF for the vehicles running through the Used Vehicle Kickback Scheme with either the ultimate sale prices for the same vehicles, as reported by Florida's Department of Motor Vehicles, or with retail pricing for the same vehicles as suggested by the N.A.R. Black Book indicates that EHF received from approximately $1,000 to approximately $2,800 less per vehicle that went through the Used Vehicle Kickback Scheme than it would have had the same vehicles been sold on a wholesale basis to dealers on the Approved Wholesaler List or through EHF's normal retail sales channels, respectively.

80.    Hodges has estimated that this pattern of unauthorized short sales to unapproved used car dealerships and the related practices described below generated losses for EHF in the millions of dollars.

Mechanics of the Used Vehicle Kickback Scheme

81.    During the Relevant Period, the Used Vehicle Kickback Scheme evolved from a relatively simple short sale scheme (of the type the Wholesale Policy had been enacted to counteract) into a much more sophisticated scheme utilizing false auction tickets and other fraudulent practices.

82.    This more complex scheme proved both more lucrative to its various participants and more difficult for EHF's senior management to detect and counteract.

83.    The basic iteration of the Used Vehicle Kickback Scheme referenced above is referred to herein as the **"Direct Sale UVKS."**   The Direct Sale UVKS is

the subject of separate adversary proceedings commenced by the Liquidating Agent substantially contemporaneously with the instant proceeding.

84.    Apparently in response to heightened scrutiny by EHF's senior management over the course of time, the Defendants created a more sophisticated version of the Used Vehicle Kickback Scheme to make it virtually impossible for EHF's senior management to detect or prevent the continued operation of the scheme.

85.    This process culminated in a more sophisticated scheme through which substantial portions of EHF's used vehicle inventory were apparently, although not actually, sold at auction through commercial auction houses; a practice that did not appear to violate EHF's Wholesale Policy but which, in fact, produced the same types of losses through fraud for EHF as the Direct Sale UVKS.

86.    This more complicated iteration of the Used Vehicle Kickback Scheme is referred to herein as the **"Auction UVKS."**

87.    To appreciate how the Auction UVKS operated in practice at EHF, it is necessary to understand how EHF structured a typical used vehicle auction sale. Such a standard transaction would typically be structured by EHF as follows:

> Step 1:  A typical used vehicle auction would be attended by anywhere from twenty to one hundred car dealer representatives intent on purchasing used cars at auction.  If EHF were selling vehicles at such an auction, it would have to physically deliver the used vehicles to the auction house; generally EHF would drop the vehicles off well in advance of the scheduled auction start time.

Step 2: Prior to the commencement of the auction, the auction company would set time aside so that potential bidders could inspect the vehicles to be auctioned.

Step 3: At the commencement of the auction, cars would be brought down one or more physical lanes of the auction. While they were rolling down the lanes, potential buyers would bid on each car in which they had an interest.

Step 4: An auctioneer employed by the auction house conducting the auction would keep track of the bids on each vehicle and select the winning bidder, i.e., the potential purchaser who offered the highest bid. Once the winning bidder was selected, the auctioneer would drop his gavel signifying the end of the auction on that particular vehicle.

Step 5: The winning bidder would then be required to pay for the vehicle he had purchased within twenty-four hours by check or wire transfer. The price that the winning bidder paid included both a buyer fee and a seller fee set by the auction house conducting the auction. Similarly, the seller of the vehicle had twenty-four hours to furnish the vehicle's title to the auction house.

Step 6: Once the auction house received full payment for the vehicle from the purchaser and the vehicle's title from the seller, the auction house would notify the purchaser that the vehicle was ready to be picked up. At this point, the auction house would generally send the title to the winning bidder by overnight delivery (if the vehicle was subject to a lien or was being floor-planned by the purchaser, the title would be sent to the lender holding, or to hold, the lien rather than to the purchaser). Finally, at this point the seller would also receive payment for the vehicle, less the applicable buyer and seller fees charged by the auction house (including fees for necessary cleaning or maintenance performed at the auction house).

Step 7:  Finally, the auction house would issue an auction ticket to the buyer and to the seller showing the identity of the purchaser, the identity of the seller, the winning bid, and all applicable fees charged by the auction house.  The auction ticket would identify the purchaser by name, not simply by a bidder number.

88.    Correct copies of the following specimen documents are incorporated herein by reference and attached as **Composite Exhibit "A"**: (1) an auction ticket executed by the buyer and the seller and issued by the auction house showing seller's name and address, buyer's name and address, selling price, and buyer's fee; (2) a check stub from the auction house showing payment of the sale price to the seller less the seller's fee and showing the identity of the buyer; (3) the title executed by seller; (4) a copy of the EHF buyer's order identifying the vehicle and the net proceeds, and (5) an EHF washout sheet showing final adjustments to the vehicle's price and the net proceeds received by EHF.  These documents illustrate how a typical, non-fraudulent, EHF auction sale would be documented.

89.    By contrast to the standard EHF auction sale transaction described above, an Auction UVKS transaction would typically be structured as follows:

Step 1:  Unlike the procedure described in Step 1 above, the vehicle being sold through the Auction UVKS would never actually be delivered to the auction house for inspection and the relevant auction house would be an Auction Defendant, i.e., either HCAA or Adesa.  In this case, no true auction would occur.  The ultimate purchaser of the vehicle would have been identified by Atkinson or a Wholesaler Defendant in advance of the "auction" and a sale price would have been agreed upon in advance of any purported auction with that ultimate purchaser.

<u>Step 2</u>:   No inspection of the vehicle at the auction house would be possible since it was never present on the auction house's premises.

<u>Step 3</u>:   The vehicle would never go down the auction lane (since it was never physically present on the auction house's premises). Accordingly, any legitimate potential buyers present at the auction would never have an opportunity to bid on the vehicle and the auction price that the vehicle could have fetched at a legitimate auction was never actually determined through public bidding.

<u>Step 4</u>:   Again, since the vehicle was never physically at the auction, it could not sold by the auctioneer at the auction following public bidding.

<u>Step 5</u>:   Rather than paying the auction house for a vehicle which it had purchased at auction, the relevant Wholesaler Defendant collected the previously agreed upon price for the vehicle directly from the ultimate purchaser.   The Wholesaler Defendant then paid a smaller amount to the relevant Auction Defendant, retained a portion of the differential as its fee, and paid the remainder of the differential to Atkinson (who orchestrated the transaction) as a commission (see also the detailed discussion of the RICO Scheme, below).   EHF might still have provided the title to the vehicle to the auction house as though the vehicle had actually been sold at auction; however, EHF, at the behest of Atkinson, would probably just provide the title to Atkinson for delivery in connection with an auction sale.   In this case, Atkinson would simply give the title to the relevant Wholesaler Defendant or even directly to the ultimate purchaser of the vehicle.   Interestingly, EHF's senior management would not have been able to determine that an Auction UVKS transaction, rather than a *bona fide* auction, had occurred even if it examined the relevant deal files since the information provided by Atkinson would indicate (fraudulently and incorrectly) that the relevant vehicle had been sold through a

traditional auction sale as described in the foregoing section in compliance with EHF's Wholesale Policy.

<u>Step 6</u>:  Once payment had been received from the ultimate purchaser by the relevant Wholesaler Defendant, that Wholesaler Defendant delivered the vehicle to the ultimate purchaser.  Once the Auction Defendant received the reduced purchase price, the title was sent by overnight delivery service to the Wholesaler Defendant for final delivery to the ultimate purchaser.  Simultaneously, the reduced sale price, less applicable fees charged by the Auction Defendant for the services that it never rendered, was transferred to EHF apparently in the ordinary course of business.  From EHF's perspective, the vehicle was sold at auction but simply did not command as high a price as might have been expected.

<u>Step 7</u>:   Finally, the Auction Defendant would issue a fraudulent auction ticket to EHF.  This fraudulent auction ticket looks much like the standard auction ticket described above but may differ in one or more of the following ways:

a)    The fraudulent auction ticket may identify the winning bidder by bidder number only, rather than by name.  This is contrary to industry standards for an auction sale.

b)    The fraudulent auction ticket may not include a seller's fee, which would also be contrary to industry standard practice. Alternatively, the fraudulent auction ticket may include a notation for a seller's fee but by previous agreement between Atkinson and the Auction Defendant no such fee would ever be paid.

90.    Correct copies of the following specimen documents illustrating an Auction UVKS transaction are incorporated herein by reference and are attached as

**Composite Exhibit "B"**: (1) an auction ticket issued by HCAA as the auction which (a) has not been executed by the buyer or the seller, (b) shows the seller's name and address but fails to show the buyer's name and address, and (c) shows the selling price and buyer's fee but is not signed by either the seller or the buyer; (2) a check stub from HCAA showing an incorrect sale price and no seller's fee and identifying the purchaser as Cars Inc.; (3) the corrected check as faxed to EHF by HCAA showing the buyer to be a different entity, i.e., HCAA-13, and showing the correct purchase price but no auction fees; and (4) a copy of the title executed by EHF as the seller.  Note that the documentation for this transaction does not include a copy of an EHF buyer's order or of an EHF washout sheet.  This composite exhibit illustrates how a typical Auction UVKS transaction was documented.  Similar documents are in the Liquidating Agent's possession for each of the transactions referenced below.

91.    The Auction UVKS relied upon the collusion of HCAA much as the Direct Sale UVKS, as defined in the adversary complaints filed substantially contemporaneously herewith, relied upon the assistance of Cars, Inc.  Like Cars Inc., HCAA charged a fee for its services in preparing the fictional auction tickets and handling the funds for Atkinson's sham transactions.  Initially, the fee charged by HCAA for these services was $60.00 per vehicle.  On or about March 1, 2004, HCAA increased its fee to $100.00 per transaction.  On or about March 1, 2005, HCAA again increased its fee to $200.00 per transaction.

Damages from Operation of Auction UVKS

92.    The operation of the Auction UVKS resulted in substantial damages to EHF.  The total damages incurred by EHF on account of the operation of the Auction

UVKS include, but are not limited to, the following damages which have been segregated by Defendant and by Defendant class:

The Wholesaler Defendants

93.     Through its actions as a Wholesaler Defendant as outlined above, Burns Auto caused EHF to suffer damages through the operation of the Auction UVKS in an amount not less than $48,452.01 but probably in excess of $91,650.44. The specific vehicle transactions in which Burns Auto participated and which underlie these damages are summarized in the annexed **Exhibit "C"** which is incorporated herein by reference.  This exhibit includes detailed information on each vehicle which this Wholesaler Defendant caused to move through the Auction UVKS process including make, model, vehicle identification number, mileage, actual sale proceeds received by EHF, and either the actual sale proceeds generated by the Auction UVKS for the relevant vehicle or, where that information was not available, average wholesale and average retail prices for that vehicle as estimated by National Auto Research, a division of Hearst Media Corporation ("**NAR**"). Throughout this Complaint, in instances where the actual sale price was not available, damage estimates are based on the more conservative wholesale estimates (although the Liquidating Agent reserves his right to pursue damages based on higher actual sale prices or, where appropriate, retail price estimates).

94.     Through its actions as a Wholesaler Defendant as outlined above, Carrollwood caused EHF to suffer damages through the operation of the Auction UVKS in an amount not less than $55,148.00 but probably in excess of $125,580.50.  The specific vehicle transactions in which Carrollwood participated and which underlie these damages are summarized in the annexed **Exhibit "D"**

which is incorporated herein by reference. This exhibit includes detailed information on each vehicle which this Wholesaler Defendant caused to move through the Auction UVKS process including make, model, vehicle identification number, mileage, actual sale proceeds received by EHF, and either the actual sale proceeds generated by the Auction UVKS for the relevant vehicle or, where that information was not available, average wholesale and average retail prices for that vehicle as estimated by NAR.

95. Through its actions as a Wholesaler Defendant as outlined above, Courtesy caused EHF to suffer damages through the operation of the Auction UVKS in an amount not less than $41,375.00 but probably in excess of $71,000.00. The specific vehicle transactions in which Courtesy participated and which underlie these damages are summarized in the annexed **Exhibit "E"** which is incorporated herein by reference. This exhibit includes detailed information on each vehicle which this Wholesaler Defendant caused to move through the Auction UVKS process including make, model, vehicle identification number, mileage, actual sale proceeds received by EHF, and either the actual sale proceeds generated by the Auction UVKS for the relevant vehicle or, where that information was not available, average wholesale and average retail prices for that vehicle as estimated by NAR.

96. Through its actions as a Wholesaler Defendant as outlined above, K&C caused EHF to suffer damages through the operation of the Auction UVKS in an amount not less than $6,760.00 but probably in excess of $19,172.50. The specific vehicle transactions in which K&C participated and which underlie these damages are summarized in the annexed **Exhibit "F"** which is incorporated herein by reference. This exhibit includes detailed information on each vehicle which this

Wholesaler Defendant caused to move through the Auction UVKS process including make, model, vehicle identification number, mileage, actual sale proceeds received by EHF, and either the actual sale proceeds generated by the Auction UVKS for the relevant vehicle or, where that information was not available, average wholesale and average retail prices for that vehicle as estimated by NAR.

97.    Through his actions as a Wholesaler Defendant as outlined above, Medgebow caused EHF to suffer damages through the operation of the Auction UVKS in an amount not less than $53,550.00 but probably in excess of $138,521.25.  The specific vehicle transactions in which Medgebow participated and which underlie these damages are summarized in the annexed **Exhibit "G"** which is incorporated herein by reference.  This exhibit includes detailed information on each vehicle which this Wholesaler Defendant caused to move through the Auction UVKS process including make, model, vehicle identification number, mileage, actual sale proceeds received by EHF, and either the actual sale proceeds generated by the Auction UVKS for the relevant vehicle or, where that information was not available, average wholesale and average retail prices for that vehicle as estimated by NAR.

The Auction Defendants

98.    Through its actions as an Auction Defendant as outlined above, HCAA caused EHF to suffer damages through the operation of the Auction UVKS in an amount not less than $391,753.00 but probably in excess of $812,214.15.  The specific vehicle transactions in which HCAA participated and which underlie these damages are summarized in the annexed **Exhibit "H"** which is incorporated herein by reference.  This exhibit includes detailed information on each vehicle which this

Auction Defendant caused to move through the Auction UVKS process including make, model, vehicle identification number, mileage, actual sale proceeds received by EHF, and either the actual sale proceeds generated by the Auction UVKS for the relevant vehicle or, where that information was not available, average wholesale and average retail prices for that vehicle as estimated by NAR.

99.     Through its actions as an Auction Defendant as outlined above, Adesa caused EHF to suffer damages through the operation of the Auction UVKS in an amount not less than $356,585.13 but probably in excess of $828,937.31.   The specific vehicle transactions in which Adesa participated and which underlie these damages are summarized in the annexed **Exhibit "I"** that is incorporated herein by reference.  With respect to Adesa, Plaintiff has not yet been able to identify all of the relevant information relating to damage calculations and reserves the right to supplement Exhibit I as relevant information becomes available.   This exhibit includes detailed information on each vehicle which this Auction Defendant caused to move through the Auction UVKS process including make, model, vehicle identification number, mileage, actual sale proceeds received by EHF, and either the actual sale proceeds generated by the Auction UVKS for the relevant vehicle or, where that information was not available, average wholesale and average retail prices for that vehicle as estimated by NAR.

The EHF Defendants

100.   Through the Auction UVKS, Atkinson caused EHF to suffer damages in an amount not less than $966,579.55 but probably in excess of $2,351,512.13. The specific vehicle transactions underlying these damages are set forth in the annexed Exhibits C through I and recapitulated in the annexed **Exhibit "J"** which is incorporated herein by reference.

101.   Through the assistance which Murphy provided to Atkinson in structuring and maintaining the Auction UVKS, Murphy caused EHF to suffer damages in an amount not less than $966,579.55 but probably in excess of $2,351,512.13.   The specific vehicle transactions underlying these damages are summarized in the annexed Exhibits C through I.

## Count I:  Fraudulent Conveyance of Used Vehicle Proceeds
### 11 U.S.C. §§ 544(b) and 550 and Florida Statute § 726.105(1)(a)

The Liquidating Agent sues Atkinson, the Wholesaler Defendants, and the Auction Defendants pursuant to 11 U.S.C. §§ 544(b) and 550 and Florida Statute § 726.105(1)(a) to avoid and recover any concealed proceeds from the sale of used vehicles owned by EHF through the Auction UVKS and received by, or for the benefit of, Atkinson, the Wholesaler Defendants, or the Auction Defendants and alleges as follows:

102.   The allegations contained in paragraphs 1 through 101 are incorporated into this count as though fully set forth herein.

103.   This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(H).

104.   The Auction UVKS was orchestrated and administered by Atkinson with the active and knowing assistance of Murphy, the Wholesaler Defendants, and the

Auction Defendants to transfer property of EHF, i.e. used vehicles, to unauthorized vehicle wholesalers at less than the prevalent fair market value for such wholesale vehicles or for other improper purposes, including personal gain, as set forth above.

105.   Exhibits C through I identify with specificity each used vehicle transaction underlying this count that the Liquidating Agent has identified to date. Exhibit J provides a single summary of all of these transactions.  Plaintiff reserves the right to supplement this count with additional transactions that may be uncovered through discovery or otherwise.

106.   The Wholesaler Defendants transferred a portion of the improperly inflated profit that they received on account of the Auction UVKS to Atkinson.

107.   Atkinson administered the Auction UVKS, with the active and knowing assistance of the Wholesaler Defendants and the Auction Defendants, with the actual intent to hinder, delay, or defraud creditors of EHF and EHF itself and thereby realize personal profit.

108.   EHF did not receive reasonably equivalent value in exchange for its used vehicles that were sold to the Wholesaler Defendants and the Auction Defendants through the Auction UVKS.

109.   Atkinson caused many of the vehicles identified in Exhibits C through I to be sold to Auction Defendants or to unauthorized Wholesaler Defendants when, under EHF's Wholesale Policy, those vehicles should have been sold to retail purchasers on one of the used vehicle sale lots owned by EHF or its affiliates.  For these vehicles, the proper measure of the damages suffered by EHF is the difference between the fair market retail price of the vehicle and the sale price actually received by EHF for that vehicle.

110.    Atkinson caused the remainder of the vehicles identified in Exhibits C through I to be sold to unauthorized Wholesaler Defendants when, under EHF's Wholesale Policy, those vehicles should have been sold (1) to the authorized wholesalers identified on the Approved Wholesaler List, (2) to franchised new car dealers, or (3) through legitimate vehicle auction houses.  For these vehicles, the proper measure of the damages suffered by EHF is the difference between the fair market wholesale price of the relevant vehicles and the sale price actually received by EHF for those vehicles.

111.    From 1999 until 2005, Atkinson was an insider of EHF as that term is defined in Florida Statute 726.102(7).   After that time, although no longer an employee of EHF, Atkinson continued to act as an agent for at least one unauthorized wholesaler, Cars Inc.

112.    Atkinson, Murphy, the Wholesaler Defendants, and the Auction Defendants actively concealed the Auction UVKS from EHF's senior management and from third parties by.  Accordingly, the Liquidating Agent could not reasonably have discovered the scope of the Used Vehicle Kickback Scheme until the discovery process was commenced in connection with this proceeding and the Liquidating Agent's other adversary proceedings related to the UVKS.

113.    During and prior to the Relevant Period, EHF was sued and threatened with suit in connection with various matters.  The litigation actually filed against EHF during the Relevant Period included Gilley v. EHF, Inc., Case No. 02-8101 which was filed in the Thirteenth Judicial Circuit in and for the County of Hillsborough, Florida.

114.    Neither Atkinson, the Wholesaler Defendants, nor the Auction Defendants took the proceeds generated by the Auction UVKS in good faith.

115.    Through the Auction UVKS, Atkinson, assisted by the Wholesaler Defendants and the Auction Defendants, removed or concealed substantial assets of EHF which otherwise would have become part of the EHF Bankruptcy Estate and would thus have been available to satisfy the claims of EHF's legitimate creditors.

116.    Beginning no later than late 2007 and continuing through the Petition Date, EHF was insolvent.

117.    During the Relevant Period, there existed creditors of EHF holding substantial unsecured claims against EHF and the funds improperly and illegally diverted from EHF through the Auction UVKS could have been used to pay such creditors by EHF or its bankruptcy estate.

118.    During at least a portion of the Relevant Period, EHF was engaged in business with unreasonably small levels of assets and incurred debts beyond its ability to repay as they became due.

WHEREFORE, the Liquidating Agent respectfully requests that the Court enter judgment against Atkinson, the Wholesaler Defendants, and the Auction Defendants in favor of the Liquidating Agent and EHF's Bankruptcy Estate (a) declaring the proceeds derived, either directly or indirectly, by such defendants from the Auction UVKS to be avoidable and recoverable under the provisions of Florida Statute §§ 726.105(1)(a) and 726.108(1) and 11 U.S.C. §§ 544(b) and 550(a)(1); (b) directing the return to EHF's Bankruptcy Estate of all proceeds derived, either directly or indirectly, by such defendants from the Auction UVKS; (c) awarding to the Liquidating Agent, on behalf of EHF's Bankruptcy Estate, an amount equal to

the difference between the fair market value for the vehicles identified in Exhibits C through I and the value actually received by EHF from the sale of those vehicles together with pre- and post-judgment interest; and (d) granting the Liquidating Agent such further relief as the Court deems just and appropriate.

## Count II:  Constructive Fraudulent Conveyance
## (Present and Future Creditors)
### 11 U.S.C. §§ 544(b) and 550 and Florida Statute § 726.105(1)(b)

The Liquidating Agent sues Atkinson, the Wholesaler Defendants, and the Auction Defendants pursuant to 11 U.S.C. § 544(b) and Florida Statute §§ 726.105(1)(b) to avoid and recover any concealed proceeds from the sale of used vehicles owned by EHF, including those identified in Exhibits C through I, through the Auction UVKS and received by, or for the benefit of, Atkinson, the Wholesaler Defendants, or the Auction Defendants and alleges as follows:

119.   The allegations contained in paragraphs 1 through 101 are incorporated into this count as though fully set forth herein.

120.   This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(H).

121.   Exhibits C through I identify with specificity each used vehicle transaction underlying this count that the Liquidating Agent has identified to date. Plaintiff reserves the right to supplement this count with additional transactions that may be uncovered through discovery or otherwise.

122.   Atkinson, the Wholesaler Defendants, and the Auction Defendants received proceeds from the Auction UVKS within four years of the Petition Date.

123.   During and prior to the operation of the Auction UVKS, there existed creditors of EHF holding substantial unsecured claims against EHF.

124.  Atkinson caused many of the vehicles identified in Exhibits C through I to be sold to the Auction Defendants or to unauthorized Wholesaler Defendants when, under applicable EHF policies including its Wholesale Policy, those vehicles should have been sold to retail purchasers on one of the used vehicle sale lots owned by EHF or its affiliates.  For these vehicles, the proper measure of the damages suffered by EHF is the difference between the fair market retail price for each such vehicle and the sale price actually received by EHF for each such vehicle.

125.  Atkinson caused the remainder of the vehicles identified in Exhibits C through I to be sold to unauthorized Wholesaler Defendants when, under applicable EHF policies including the Wholesale Policy, those vehicles should have been sold to authorized wholesalers, franchised new car dealers, or legitimate vehicle auction houses.  For these vehicles, the proper measure of the damages suffered by EHF is the difference between the fair market wholesale price for each such vehicle and the sale price actually received by EHF for each such vehicle.

126.  EHF did not receive reasonably equivalent value in exchange for its used vehicles which were sold to the Wholesaler Defendants and the Auction Defendants through the Auction UVKS for less than their fair market wholesale or retail value, as applicable.

127.  Atkinson had complete control over and access to the financial books and records of the EHF wholesale department throughout his employment with EHF. Indeed, upon information and belief, the EHF Defendants had access to substantially more financial information regarding EHF's wholesale department than has been provided to the Liquidating Agent or than was available to EHF's senior management.

128.    Beginning no later than late 2007 and continuing through the Petition Date, EHF was insolvent.    During the Relevant Period, the Auction UVKS was ongoing and contributed to the insolvency of EHF.

129.    During at least a portion of the Relevant Period, EHF was engaged in business with unreasonably small levels of assets and incurred debts beyond its ability to repay as they became due.

WHEREFORE, the Liquidating Agent respectfully requests that the Court enter judgment against Atkinson, the Wholesaler Defendants, and the Auction Defendants and in favor of the Liquidating Agent and EHF's Bankruptcy Estate (a) declaring the proceeds derived, either directly or indirectly, by such defendants from the Auction UVKS, to be avoidable and recoverable under the provisions of Florida Statute §§ 726.105(1)(b) and 726.108(1) and 11 U.S.C. §§ 544(b) and 550(a)(1); (b) directing the return to EHF's Bankruptcy Estate of all such proceeds derived, either directly or indirectly, by such defendants from the Auction UVKS; (c) awarding to the Liquidating Agent, on behalf of EHF's Bankruptcy Estate, an amount equal to such proceeds derived, either directly or indirectly, by such defendants from the Auction UVKS together with pre- and post-judgment interest; and (d) granting the Liquidating Agent such further relief as the Court deems just and appropriate.

## **Count III:  Constructive Fraudulent Conveyance (Present Creditors)**
### 11 U.S.C. §§ 544(b) and 550 and Florida Statute § 726.106(1) and (2)

The Liquidating Agent sues Atkinson, the Wholesaler Defendants, and the Auction Defendants pursuant to 11 U.S.C. §§ 544(b) and 550 and Florida Statute §§ 726.106(1) and (2) to recover any concealed proceeds from the sale of used vehicles owned by EHF, including those identified in Exhibits C through I, received by, or for the benefit of, Atkinson, the Wholesaler Defendants, or the Auction Defendants on account of the Auction UVKS and alleges as follows:

130.    The allegations contained in paragraphs 1 through 101 are incorporated into this count as though fully set forth herein.

131.    This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(H).

132.    Atkinson, the Wholesaler Defendants, and the Auction Defendants improperly received proceeds from the Auction UVKS within four years of the Petition Date.

133.    Exhibits C through I identify with specificity each used vehicle transaction underlying this count that the Liquidating Agent has identified to date. Plaintiff reserves the right to supplement this count with additional transactions that may be uncovered through discovery or otherwise.

134.    Prior to the operation of the Auction UVKS, there existed creditors of EHF holding substantial unsecured claims against EHF.

135.    Atkinson caused many of the vehicles identified in Exhibits C through I to be sold to the Auction Defendants or to unauthorized Wholesaler Defendants when, under EHF's Wholesale Policy, those vehicles should have been sold to retail purchasers on one of the used vehicle sale lots owned by EHF or its affiliates.  For these vehicles, the proper measure of the damages suffered by EHF is the

difference between the fair market retail price of the vehicles and the sale price actually received by EHF for those vehicles.

136.   Atkinson caused the remainder of the vehicles identified in Exhibits C through I to be sold to Auction Defendants and unauthorized Wholesaler Defendants when, under EHF's Wholesale Policy, those vehicles should have been sold (1) to authorized wholesalers, (2) to franchised new car dealers, or (3) through legitimate vehicle auction houses. For each of these vehicles, the proper measure of the damages suffered by EHF is the difference between the fair market wholesale price of the vehicle and the sale price actually received by EHF for that vehicle.

137.   EHF did not receive reasonably equivalent value in exchange for its used vehicles which were sold to the Wholesaler Defendants and the Auction Defendants through the Auction UVKS for less than their fair market wholesale or their retail value, as applicable.

138.   Beginning no later than 2007 and continuing through the Petition Date, EHF was insolvent.  The operation of the Used Vehicle Kickback Scheme continued to operate during this period and contributed to the insolvency of EHF.

139.   During at least a portion of the Relevant Period, EHF was engaged in business with unreasonably small levels of assets and incurred debts beyond its ability to repay as they became due.

140.   Throughout a period no shorter than October, 1999, through June, 2005, Atkinson was an insider of EHF as the term "insider" is defined in Florida Statute Ch. 726.102(7).

WHEREFORE, the Liquidating Agent respectfully requests that the Court enter judgment against Atkinson, the Wholesaler Defendants, and the Auction Defendants

and in favor of the Liquidating Agent and EHF's Bankruptcy Estate (a) declaring the proceeds derived, either directly or indirectly, by such defendants from the Auction UVKS, i.e., those proceeds in excess of the proceeds for the vehicles identified in Exhibits C through I actually received by EHF, to be avoidable and recoverable under the provisions of Florida Statute §§ 726.106(1) and (2) and 726.108(1) and 11 U.S.C. §§ 544(b) and 550(a)(1); (b) directing the return to EHF's Bankruptcy Estate of all such excess proceeds derived, either directly or indirectly, by such defendants from the Auction UVKS; (c) awarding to the Liquidating Agent, on behalf of EHF's Bankruptcy Estate, an amount equal to such excess proceeds derived, either directly or indirectly, by such defendants from the operation of the Auction UVKS together with pre- and post-judgment interest; and (d) granting the Liquidating Agent such further relief as the Court deems just and appropriate.

## Count IV:  Florida Racketeer Influenced and Corrupt Organizations Act
### Florida Statute § 772.103 (3) and (4) and § 772.104(1)

The Liquidating Agent sues Defendants Atkinson, HCAA, and Medgebow (collectively, the **"RICO Defendants"**) pursuant to Florida Statute § 772.103(3) and (4) and § 772.104(1) to recover treble damages for the proceeds derived by any of the Defendants from the sale of the EHF used vehicles, including those identified in Exhibits C through I, through the Auction UVKS and alleges as follows:

141.  The allegations contained in paragraphs 1 through 101 are incorporated into this count as though fully set forth herein.

142.  This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A), (E), (H), and (O) and, in the case of Atkinson only, 11 U.S.C. § 157(b)(2)(C).

143.   Beginning in or about 2002, the RICO Defendants embarked upon a complex enterprise to defraud EHF; this enterprise violated various Florida criminal statutes as set forth in greater detail below.

144.   Exhibits C through I identify with specificity each used vehicle transaction underlying this count that the Liquidating Agent has identified to date. Plaintiff reserves the right to supplement this count with additional transactions that may be uncovered through discovery or otherwise.

145.   The RICO Defendants worked collectively through a distinct association-in-fact enterprise (the **"RICO Scheme"**) to perpetrate that portion of the Auction UVKS that involved the Predicate Acts, as defined below.

146.   The complex activities comprising the RICO Scheme which have been discovered by the Liquidating Agent to date can be summarized as follows:

a.      In or about February 2002, Atkinson became an undisclosed agent of Cars Inc.  EHF was unaware that its full-time wholesale manager had entered into an agency relationship with Cars Inc., a vehicle wholesaler that was not then, and never had been, on the Approved Wholesaler List.

b.      Beginning in February 2002, Atkinson, in his capacity as the full-time wholesale manager of EHF, began to orchestrate a series of used vehicle transactions designed to divert sale proceeds from EHF, the owner of the vehicles being sold (including those vehicles identified in Exhibits C through I and referenced herein as the **"RICO Vehicles"**), to himself, other RICO Defendants, other Defendants identified elsewhere in this Complaint and, upon information and belief, other entities which the Liquidating Agent has been unable to identify.

c.      Atkinson conducted these transactions through Cars Inc., certain Wholesaler Defendants, and HCAA, in order to conceal the nature of the transactions from EHF's senior management.  Specifically, Atkinson was able to conceal from EHF's senior management and others (1) the identities of the actual purchasers of the RICO Vehicles; (2) the true selling prices of the RICO Vehicles, and (3) the fact that a portion of the proceeds from their sale was being transferred to Atkinson, through his undisclosed agency relationships with Cars Inc. and, upon information and belief, other Wholesaler Defendants.

d.      Initially, Atkinson sold RICO Vehicles through Adesa.

e.      He represented to Adesa that the RICO Vehicles were being sold on behalf of Cars Inc. (not on behalf of EHF, the actual owner of the RICO Vehicles being sold).

f.      Immediately following the auction sale at Adesa of these RICO Vehicles at which the fair market wholesale value for the RICO Vehicles was established through a legitimate commercial auction (the **"Auction Price"**), Atkinson caused EHF to sell those RICO Vehicles to Cars Inc. at prices substantially lower than the Auction Price for the same RICO Vehicles (the lower price being referred to herein as the **"Haire Price"**).

g.      Atkinson then caused Adesa to pay the Auction Price to Cars Inc. and caused Cars Inc., in turn, to pay the lower Haire Price to EHF.

h.      Cars Inc. retained a brokerage fee of approximately $125 per RICO Vehicle sold in this fashion.

i.      Finally, Atkinson caused Cars Inc. to pay the difference between the Auction Price and the Haire Price, less the Cars Inc. fee, to himself as an undisclosed "commission."

j.      Over time, Atkinson recruited the other RICO Defendants and the mechanics of the RICO Scheme evolved such that they included variations similar to the Auction UVKS described above.

k.      Because Cars Inc. was not on the Authorized Wholesaler List, Atkinson brought HCAA, an auction house that could properly buy EHF used vehicles under the Wholesale Policy, into the RICO Scheme.

l.      The role of HCAA was to further obfuscate the mechanics of the transactions through which the RICO Vehicles were sold making it more difficult for EHF's senior management to detect the fraud.

m.      Specifically, HCAA created false and fraudulent auction tickets purporting to show that the RICO Vehicles which were the subject of the false auction tickets had been sold through a standard commercial auction as described in the *Mechanics of the Used Vehicle Kickback Scheme – the Auction UVKS* Section of this Complaint.  Such a practice, had it actually occurred, would have been in accordance with the Wholesale Policy.

n.      In fact, none of the RICO Vehicles were ever sold through a standard commercial auction at HCAA; instead, HCAA issued false auction tickets to EHF which purported to show auction sales of the RICO Vehicles to third party purchasers.

o.    The false auction tickets showed "auction" sale prices for the RICO Vehicles that were substantially lower than the actual prices negotiated for the sale of those RICO Vehicles by Atkinson.

p.    The HCAA auction tickets did not disclose to EHF the identity of the purported winning bidder on the RICO Vehicles; the purported purchasers identified on the false auction tickets were nominees of Atkinson often identified simply as either "HCAA-13" or "HCAA-797."

q.    Instead of selling the RICO Vehicles at legitimate HCAA auctions, as represented to EHF by Atkinson and HCAA through false auction tickets and orally, Atkinson, in the name of Cars Inc., continued to sell the RICO Vehicles for much higher prices at Adesa auctions and through prearranged sales to third party purchasers.  The details of the sales of each of these RICO Vehicles is set forth in Exhibits C through I.  Upon information and belief, not one of the RICO Vehicles which Atkinson reported to EHF as having been sold through legitimate auctions at HCAA ever actually travelled down an auction lane or was the subject of competitive bidding.

r.    The true purchasers of these RICO Vehicles paid Cars Inc. for the Vehicles; Cars Inc. then paid HCAA the Haire Price plus a $60 "auction fee."

s.    HCAA then remitted the Haire Price to EHF and retained the "auction fee."

t.    Cars Inc. retained $125 per vehicle from the true proceeds from the sale of a RICO Vehicle as a "brokerage fee" and remitted the remaining proceeds from the sale of that RICO Vehicle to Atkinson as an undisclosed "commission."

u.     Medgebow was one of the nominees of Atkinson who acquired RICO Vehicles through the RICO Scheme.

v.     For acting as one of Atkinson's nominees in the RICO Scheme, Medgebow received a portion of the proceeds from the sale of the RICO Vehicles that he "purchased."

w.     In the transactions where Medgebow acted as Atkinson's nominee, Atkinson would cause Cars Inc. to pay Medgebow a price for the RICO Vehicles that was higher than the Haire Price but lower than the Auction Price.  For purposes of illustration, assume that the Auction Price was $5,000 and the Haire Price was $3,800.  Atkinson might cause Cars Inc. to pay Medgebow $4,060.

x.     Medgebow would then pay to HCAA the Haire Price (which HCAA would, in turn, pay to EHF) plus the "auction fee" and retain the remainder of the funds that he had received from Cars Inc.  In our example, Medgebow would have received $4,060, transferred $3,860 to HCAA, and retained the remaining $200 as his compensation for participating in the RICO Scheme.

y.     Finally, Cars Inc. would deduct its $125 brokerage fee from the funds remaining in its possession and then transfer the balance to Atkinson as his undisclosed "commission."   In our hypothetical example, Cars Inc. would have received $5,000 from the sale of the hypothetical RICO Vehicle, transferred $4,060 to Medgebow, and been left with $940.  From these funds Cars Inc. would retain $125 as its fee and transfer the remaining $815 to Atkinson as his undisclosed "commission."  In this example, EHF would be informed that the hypothetical RICO Vehicle had sold for $3,800, instead of the actual $5,000 Auction Price and would be provided with a false auction ticket from HCAA confirming the $3,800 price.

z.     Through the RICO Scheme, Cars Inc. alone paid Atkinson in excess of $250,000 in commissions.   Upon information and belief, Atkinson had similar agency relationships with other wholesalers.

aa.    EHF was not aware that Cars Inc. had paid Atkinson any funds in connection with the sale of EHF vehicles.

147.   In furtherance of the RICO Scheme, as summarized above, the RICO Defendants engaged in over four hundred (400) discrete and illegal criminal transactions, each composed of multiple Predicate Acts, as defined below.   Detailed information regarding each of these transactions is set forth in Exhibits C through I.

148.   For purposes of this Count IV, the term "**Predicate** Acts" shall include, but not be limited to, those actions described above and incorporated herein as well as the following:

A.     In violation of Florida Statute § 812.014, Atkinson knowingly obtained the RICO Vehicles from EHF for the purpose of defrauding EHF and knowingly sold the RICO Vehicles and fraudulently retained a portion of the proceeds with the specific intent to permanently deprive EHF of the full benefit of the RICO Vehicles and the proceeds thereof.

B.     In violation of Florida Statute § 812.014, Atkinson knowingly obtained the RICO Vehicles from EHF and knowingly sold the RICO Vehicles and appropriated portions of the proceeds for the benefit of HCAA, Medgebow, and Cars Inc. with the specific intent to permanently deprive EHF of the full benefit of the RICO Vehicles and the proceeds thereof.

C.     In violation of Florida Statute § 812.014, HCAA knowingly obtained the proceeds of certain of the RICO Vehicles as identified in Exhibits C through I with the intent to permanently deprive EHF of the full benefit of those RICO Vehicles and the proceeds thereof.

D.      In violation of Florida Statute § 812.014, Medgebow knowingly obtained proceeds of certain of the RICO Vehicles identified in Exhibits C through I with the intent to permanently deprive EHF of the full benefit of those RICO Vehicles and the proceeds thereof.

E.      In violation of Florida Statute § 817.034(4)(a), Atkinson, Medgebow, and HCAA engaged in an organized scheme to defraud EHF and thereby obtained the RICO Vehicles and a portion of their proceeds.

F.      In violation of Florida Statute § 812.017(2), the RICO Defendants, individually and collectively, used false receipts, e.g., the fraudulent auction tickets described herein, to obtain money, i.e., that portion of the RICO Vehicle sale proceeds fraudulently withheld from EHF pursuant to the RICO Scheme and the broader Used Vehicle Kickback Scheme and the Auction UVKS.

G.      In violation of Florida Statute § 817.034(4)(b), HCAA repeatedly transmitted false auction tickets by wire (via facsimile transmission) to EHF in furtherance of the RICO Scheme (and specifically the Auction UVKS) to defraud EHF; HCAA did so with the specific intent to obtain proceeds from the sale of the RICO Vehicles.

H.      In violation of Florida Statute § 817.52(1), the RICO Defendants, with the specific intent to defraud EHF, obtained custody of the RICO Vehicles by deceit and fraudulent misrepresentation.

I.      In violation of 18 U.S.C. § 1343, the RICO Defendants, with the specific intent to defraud EHF and with the intent of obtaining the RICO Vehicles and their proceeds by means of false pretenses and false representations, communicated with each other by telephone and by facsimile transmission to further the RICO Scheme and the broader Used Vehicle Kickback Scheme and the Auction UVKS.

J.      In violation of Florida Statute § 777.04(3) and 18 U.S.C. § 1349, the RICO Defendants, conspired with each other and with one or more of the other Defendants named in this Complaint to commit the offenses described above in furtherance of the RICO Scheme and the broader Used Vehicle Kickback Scheme and the Auction UVKS.

149.   The foregoing Predicate Acts were all part of the RICO Scheme and the Auction UVKS and were thus intrinsically interrelated.

150.   The foregoing Predicate Acts, all part of the RICO Scheme and the Auction UVKS, were undertaken for the purpose of defrauding EHF for the benefit of the RICO Defendants and one or more of the other Defendants named in this Complaint and thus demonstrated illegal and criminal conduct which occurred continuously over a period of at least three (3) years.

151.   Through the RICO Scheme and the Auction UVKS, the RICO Defendants committed numerous Predicate Acts during the Relevant Period.

152.   As a result of the actions taken by the RICO Defendants in furtherance of the RICO Scheme and the broader Used Vehicle Kickback Scheme, EHF suffered serious financial injury.  Specifically, EHF was underpaid for the sale of certain of its used vehicles, including those identified in Exhibits C through I, that were sold through the RICO Scheme and the Auction UVKS over a roughly six (6) year period. Hodges estimates that the resulting losses to EHF exceed four hundred thousand dollars ($400,000).

153.   The Liquidating Agent is obligated to pay his attorney a reasonable fee for his professional services rendered in connection with filing and prosecuting this Count IV and the Complaint as a whole.

WHEREFORE, the Liquidating Agent respectfully requests that the Court enter judgment against the RICO Defendants, jointly and severally, and in favor of the Liquidating Agent and EHF's Bankruptcy Estate (a) for threefold the actual damages sustained by EHF on account of the RICO Scheme under the provisions of Florida Statute §§ 772.103 (2), (3), and (4) and 772.104(a) and 11 U.S.C. § 544(b); (b) for the Liquidating Agent's reasonable attorney's fees and costs in commencing and prosecuting this proceeding, and (c) granting the Liquidating Agent such further relief as the Court deems just and appropriate.

## Count V:  Civil Theft
### Florida Statute §§ 772.11, 812.014(1), and 812.017(2)

The Liquidating Agent sues Atkinson, HCAA, Medgebow, and Courtesy (the **"Civil Theft Defendants"**) under Florida Statute §§ 772.11, 812.014(1), and 812.017(2) to recover any proceeds from the sale of EHF's used vehicles, including those identified in Exhibits C through I, through the Auction UVKS and specifically through the RICO Scheme and received by, or for the benefit of, any of the EHF Defendants, the Wholesaler Defendants, or the Auction Defendants and alleges as follows:

154.   The allegations contained in paragraphs 1 through 101 and in paragraphs 141 through 153 are incorporated into this count as though fully set forth herein.

155.   This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A), (E), (H), and (O) and, in the case of Atkinson only, 11 U.S.C. § 157(b)(2)(C).

156.   Through the Auction UVKS and the RICO Scheme, both as described in detail in the general allegations section and in Count IV of this Complaint, the Civil

Theft Defendants knowingly and with felonious intent obtained and used certain property of EHF, i.e., that portion of EHF's used vehicle inventory which was sold through the Used Vehicle Kickback Scheme and the RICO Scheme as well as the proceeds of such inventory, through an intricate and sophisticated scheme of deceit and theft.

157.    Through the Used Vehicle Kickback Scheme and the RICO Scheme, both as described in detail elsewhere in this Complaint, the Civil Theft Defendants knowingly deprived EHF of its rights to a portion of the proceeds from the sale of certain EHF used vehicles, including those identified with specificity in Exhibits C through I.

158.    Through the Used Vehicle Kickback Scheme and the RICO Scheme, both as described in detail elsewhere in this Complaint, the Civil Theft Defendants knowingly appropriated certain of EHF's property, i.e., a portion of the proceeds from used vehicles belonging to EHF, including those identified in Exhibits C through I, for their own use or for the use of other Defendants named in this Complaint.

159.    Through the Auction UVKS and the RICO Scheme, both as described in detail elsewhere in this Complaint, the Civil Theft Defendants, individually and collectively, coordinated the activities of one or more of the defendants named in this Complaint in orchestrating and carrying out the Auction UVKS and the RICO Scheme.

160.    The Civil Theft Defendants, individually and collectively, used false receipts, e.g., the false auction tickets described in detail in Count IV, to obtain money, i.e., that portion of the sale proceeds fraudulently withheld from EHF from the sale of the RICO Vehicles.

161.  The Civil Theft Defendants, individually and collectively, actively concealed the operation of both the Auction UVKS and the RICO Scheme from EHF's senior management and owners.

162.  Plaintiff has previously made written demand upon each of the Civil Theft Defendants for the return of the proceeds of the Auction UVKS and the RICO Scheme.   Correct copies of these demand letters are annexed as **Composite Exhibit "K"** and are incorporated herein by reference.   Plaintiff has received no response to his demand letters.

WHEREFORE, the Liquidating Agent respectfully requests that the Court enter judgment against the Civil Theft Defendants, jointly and severally, and in favor of the Liquidating Agent and EHF's Bankruptcy Estate (a) for threefold the actual damages sustained by EHF on account of the Auction UVKS under the provisions of Florida Statute §§ 772.11, 812.014(1), and 812.017(2) and 11 U.S.C. §§ 544(b); (b) for pre-judgment interest on the actual damages sustained by EHF on account of the Auction UVKS, and (c) granting the Liquidating Agent such further relief as the Court deems just and appropriate.

## Count VI:  Conversion of Certain Used Vehicle Proceeds
### Applicable Florida Law

The Liquidating Agent sues Atkinson, the Wholesaler Defendants, and the Auction Defendants under applicable Florida law relating to conversion to recover any proceeds from the sale of certain of EHF's used vehicles, including those identified with specificity in Exhibits C through I, through the Auction UVKS and received by, or for the benefit of, any of the EHF Defendants, the Wholesaler Defendants, or the Auction Defendants and alleges as follows:

163.   The allegations contained in paragraphs 1 through 101 are incorporated into this count as though fully set forth herein.

164.   This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A), (E), (H), and (O) and, in the case of Atkinson only, 11 U.S.C. § 157(b)(2)(C).

165.   Exhibits C through I identify with specificity each used vehicle transaction underlying this count that the Liquidating Agent has identified to date. Plaintiff reserves the right to supplement this count with additional transactions that may be uncovered through discovery or otherwise.

166.   Through the Auction UVKS, as described in the foregoing general allegations, Atkinson, the Wholesaler Defendants, and the Auction Defendants all wrongfully and permanently exercised dominion over proceeds from the sale of used vehicles which proceeds rightfully belonged to EHF.

167.   This dominion was exercised surreptitiously, through deceit, and to the detriment of EHF as the rightful owner of all such proceeds.

168.   This dominion was exercised, in part, in the four years leading up to EHF's bankruptcy filing.

169.   This dominion was exercised by the aforementioned Defendants knowingly and with the intent to permanently deprive EHF of property to which it was rightfully entitled; such dominion was exercised to the exclusion of and in defiance of EHF's absolute rights to the proceeds derived from the sale of its used vehicles, including those identified in Exhibits C through I.

170.   Atkinson, as an employee and manager of EHF, owed a fiduciary duty to EHF and had an obligation to ensure that all of the sale proceeds derived from used vehicles entrusted by EHF to him be promptly delivered to EHF following the

relevant sales.  None of the Defendants named in the Complaint had authority to take any other action with respect to such proceeds derived from the sale of EHF used vehicle inventory or to divert those proceeds in any way (and especially not secretly to themselves).

171.  The Auction UVKS was not authorized by EHF nor was the retention by the aforementioned Defendants of any proceeds derived from the sale of EHF used vehicle inventory.  Indeed, Atkinson and, to a lesser degree, the Wholesaler Defendants and the Auction Defendants actively and systematically hid the scheme from EHF's senior management and owners.

172.  EHF was initially unaware of the existence of the Auction UVKS and did not become aware of its true scope until well after its bankruptcy filing as a result of an investigation commenced by the Liquidating Agent.

173.  Through the Auction UVKS, Atkinson, the Wholesaler Defendants, and the Auction Defendants improperly deprived EHF of the possession of its property, i.e., a portion of the sale proceeds derived from the sale of certain of EHF's used vehicles, including those identified in Exhibits C through I, which was sold to unauthorized wholesalers through the Auction UVKS.

174.  The Liquidating Agent did not make demand upon Atkinson, the Wholesaler Defendants, or the Auction Defendants for the return of such proceeds because the transfer of such vehicles to unauthorized wholesalers had been intentionally hidden from EHF, because the relevant transactions occurred years ago, and because, therefore, it is reasonable to assume that any such demand would have been futile.  In addition, the Liquidating Agent did not wish to provide

defendants with advanced warning that this proceeding would be commenced in an effort to preserve evidence.

WHEREFORE, the Liquidating Agent respectfully requests that the Court enter judgment against Atkinson, the Wholesaler Defendants, and the Auction Defendants, jointly and severally, and in favor of the Liquidating Agent and EHF's bankruptcy estate (a) awarding to the Liquidating Agent, on behalf of EHF's Bankruptcy Estate, an amount equal to the proceeds derived, either directly or indirectly, by the defendants from the operation of the Auction UVKS together with pre- and post-judgment interest and (b) granting the Liquidating Agent such further relief as the Court deems just and appropriate.

## Count VII:  Civil Conspiracy - Conversion
### Applicable Florida Law

The Liquidating Agent sues the EHF Defendants, the Wholesaler Defendants, and the Auction Defendants under applicable Florida relating to civil conspiracy to recover any proceeds from the sale of certain used vehicles owned by EHF, including those identified with specificity in Exhibits C through I, through the Auction UVKS and received by, or for the benefit of, any of the EHF Defendants, the Wholesaler Defendants, or the Auction Defendants and alleges as follows:

175.  The allegations contained in paragraphs 1 through 101 and in paragraphs 164 through 174 are incorporated into this count as though fully set forth herein.

176.  This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A), (E), (H), and (O) and, in the case of Atkinson only, 11 U.S.C. § 157(b)(2)(C).

177.   The EHF Defendants, the Wholesaler Defendants, and the Auction Defendants entered into a confederation to execute the complex, fraudulent, and illegal Auction UVKS to the detriment of EHF.

178.   The Auction UVKS encompasses the series of independent torts described in this Complaint which could have been redressed through one or more causes of action had it been perpetrated by a single individual; specifically with respect to this Count VII, the Auction UVKS encompasses the independent tort of conversion as set forth in Court VI.

179.   Each of the EHF Defendants, the Wholesaler Defendants, and the Auction Defendants took affirmative actions in furtherance of the conspiracy to commit the Auction UVKS as a whole and to commit the conversion described in Count VI in particular.

180.   As a result of the actions taken by the EHF Defendants, the Wholesaler Defendants, and the Auction Defendants in furtherance of the conspiracy to convert a portion of the proceeds from the sale of certain of EHF's used vehicles, including those identified with specificity in Exhibits C through I, EHF suffered substantial injury. Hodges estimates that the resulting losses to EHF far exceed one million dollars ($1,000,000).   Plaintiff reserves the right to supplement this count with additional transactions that may be uncovered through discovery or otherwise.

181.   The conspiracy commenced no later than 2002 and ended, if at all, no earlier than 2005.

WHEREFORE, the Liquidating Agent respectfully requests that the Court enter judgment against the EHF Defendants, the Wholesaler Defendants, and the Auction Defendants, jointly and severally, and in favor of the Liquidating Agent and EHF's

Bankruptcy Estate awarding to the Liquidating Agent, on behalf of EHF's Bankruptcy Estate, an amount equal to the proceeds derived, either directly or indirectly, by such Defendants from the conspiracy to convert property of EHF for their personal benefit together with pre- and post-judgment interest and granting the Liquidating Agent such further relief as the Court deems just and appropriate.

### Count VIII:  Unjust Enrichment as to Certain Used Vehicles
Applicable Florida Law

The Liquidating Agent sues Atkinson, the Wholesaler Defendants, and the Auction Defendants under applicable Florida law relating to unjust enrichment to recover any proceeds from the sale of certain used vehicles belonging to EHF, including those identified in Exhibits C through I, through the operation of the Auction UVKS and alleges as follows:

182.  The allegations contained in paragraphs 1 through 101 are incorporated into this count as though fully set forth herein.

183.  This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A), (E), (H), and (O) and, in the case of Atkinson only, 11 U.S.C. § 157(b)(2)(C).

184.  The aforementioned Defendants received a direct benefit from EHF through the operation of the Auction UVKS, although that benefit was hidden from EHF, in the form of a portion of the proceeds from the sale of certain used vehicles owned by EHF, including those identified with specificity in Exhibits C through I. Plaintiff reserves the right to supplement this count with additional transactions that may be uncovered through discovery or otherwise.  Such proceeds should rightfully have all belonged to EHF.

185.    Similarly, the aforementioned Defendants received a direct benefit from EHF in the form of dealer service performed on many of the used vehicles flowing through the Auction UVKS, including those identified with specificity in Exhibits C through I, at no cost to such Defendants.    Plaintiff reserves the right to supplement this count with additional transactions that may be uncovered through discovery or otherwise.

186.    At least a portion of the direct benefit from EHF received by the aforementioned Defendants was received in the four years preceding EHF's bankruptcy filing.

187.    Atkinson, the Wholesaler Defendants, and the Auction Defendants knew that they were receiving a benefit from EHF and voluntarily accepted that benefit; indeed, they orchestrated the receipt of such benefit from EHF through the complex scheme based upon deceit and fraud described herein and kept that scheme hidden from EHF's senior management.

188.    That benefit was conferred upon the Defendants (1) by EHF through the unauthorized sale of EHF used car inventory to unauthorized wholesalers and Auction Defendants at artificially low prices through the Auction UVKS and (2) through the secret receipt of a portion of the proceeds from the sale of certain of EHF's used vehicles, including those identified in Exhibits C through I and (3) through the secret use of EHF's service facilities to provide vehicle service for the exclusive benefit of certain Defendants at the exclusive cost of EHF.

189.    All of the Defendants were aware that EHF was the source of the used vehicles that were sold through the operation of the Auction UVKS.

190.   Since Atkinson, the Wholesaler Defendants, and the Auction Defendants (a) received these benefits as a result of the unauthorized transfer of property of EHF; (b) received these benefits in part while the EHF Defendants were employees of EHF and owed a fiduciary duty to EHF; (c) received these benefits as a result of knowingly and intentionally violating EHF's Wholesale Policy which prohibited the sale of its used vehicles to purchasers not on the Approved Wholesaler List, (d) paid nothing themselves for the secret benefits which they received, and (e) took steps to actively hide their receipt of these benefits from EHF's senior management through deceit and fraudulent misrepresentations, it would be inequitable to permit the Defendants to retain such benefits at the expense of EHF's Bankruptcy Estate.

191.   Through the Used Vehicle Kickback Scheme, Atkinson, the Wholesaler Defendants, and the Auction Defendants have been unjustly enriched at the expense of EHF's Bankruptcy Estate.

WHEREFORE, the Liquidating Agent respectfully requests that the Court enter judgment against Atkinson, the Wholesaler Defendants, and the Auction Defendants, jointly and severally, and in favor of the Liquidating Agent and EHF's Bankruptcy Estate (a) awarding to the Liquidating Agent, on behalf of EHF's Bankruptcy Estate, damages for unjust enrichment in an amount equal to the proceeds derived, either directly or indirectly, by the Defendants named in this Count from the Auction UVKS (including the value of vehicle service provided by EHF on the relevant vehicles for the sole benefit of the Defendants) together with pre- and post-judgment interest and (b) granting the Liquidating Agent such further relief as the Court deems just and appropriate.

## Count IX:  Breach of Fiduciary Duty
### Applicable Florida Law

The Liquidating Agent sues Atkinson under applicable Florida law relating to breaches of fiduciary duty to recover any concealed proceeds from the sale of certain of EHF's used vehicles, including those identified in Exhibits C through I, through the Auction UVKS and received by, or for the benefit of, any of the EHF Defendants, the Wholesaler Defendants, or the Auction Defendants and alleges as follows:

192.    The allegations contained in paragraphs 1 through 101 are incorporated into this count as though fully set forth herein.

193.    This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A), (E), (H), and (O) and, in the case of Atkinson only, 11 U.S.C. § 157(b)(2)(C).

194.    Exhibits C through I identify with specificity each used vehicle transaction underlying this count that the Liquidating Agent has identified to date. Plaintiff reserves the right to supplement this count with additional transactions that may be uncovered through discovery or otherwise.

195.    Atkinson was employed by EHF in a position of responsibility and trust that required Atkinson to act for EHF as the manager of its wholesale department. As EHF's Wholesale Manager, he was a senior employee with management discretion akin to that of an officer in a typical corporation.

196.    In connection with his employment as EHF's Wholesale Manager, EHF reposed confidence in Atkinson and Atkinson accepted the trust inherent in his senior position as a manager with EHF.

197.    Accordingly, Atkinson owed EHF a fiduciary duty.

198.  Atkinson breached that fiduciary duty owed to EHF through (a) his secret knowledge of the Auction UVKS, (b) his involvement and active participation in the Auction UVKS, (c) his concealment of the existence of the Auction UVKS from EHF's senior management despite his knowledge that the vehicles used to perpetrate the scheme, including those identified in Exhibits C through I, belonged to EHF and that EHF's Wholesale Policy specifically prohibited the sale of such vehicles to entities not on the Approved Wholesaler List, (d) his profiting personally from his participation in the schemes at the expense of EHF, and (e) his intentional actions in concealing his personal benefit derived from the operation of the Auction UVKS from EHF's senior management and owners.

199.  As a proximate result of the participation of Atkinson in the Auction UVKS, EHF suffered substantial damages.  Hodges has estimated that these damages are far in excess of one million dollars ($1,000,000).

200.  At least a portion of such damages was suffered by EHF in the four years preceding its bankruptcy filing.

WHEREFORE, the Liquidating Agent respectfully requests that the Court enter judgment against Atkinson and in favor of the Liquidating Agent and EHF's Bankruptcy Estate (a) awarding to the Liquidating Agent, on behalf of EHF's Bankruptcy Estate, damages against Atkinson for his breach of his fiduciary duties owed to EHF in an amount equal to the proceeds derived, either directly or indirectly, by Atkinson from the Auction UVKS together with pre- and post-judgment interest and (b) granting the Liquidating Agent such further relief as the Court deems just and appropriate.

### Count X:  Equitable Accounting
### 11 U.S.C. § 542(a) and Applicable Florida Law

The Liquidating Agent sues Atkinson and Murphy for an equitable accounting under applicable Florida law and under 11 U.S.C. § 542(a) and in support thereof alleges as follows:

201.  The allegations contained in paragraphs 1 through 101 are incorporated into this count as though fully set forth herein.

202.  This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A), (E), (H), and (O) and, in the case of Atkinson only, 11 U.S.C. § 157(b)(2)(C).

203.  Atkinson was employed by EHF in a position of responsibility and trust as EHF's Wholesale Manager.

204.  Murphy was employed by EHF in a position of responsibility and trust as the personal assistant to the manager of EHF's wholesale department.

205.  Accordingly, a relationship of confidence and trust existed between EHF, on the one hand, and Atkinson and Murphy, on the other.

206.  Additionally, a fiduciary relationship existed between, EHF and Atkinson in his capacity as EHF's Wholesale Manager.

207.  Upon information and belief, there were no written employment contracts between EHF and the EHF Defendants.

208.  Property of EHF improperly came into the possession of Atkinson through the operation of the Auction UVKS.

209.  Upon information and belief, property of EHF improperly came into the possession of Murphy through the operation of the Auction UVKS.

210.  Each of the EHF Defendants failed to disclose the benefits which he or she secretly received from the operation of the Auction UVKS to his or her employer

EHF despite the fact that he or she was aware that the origin of such benefits was used vehicles owned by EHF, including those identified with specificity in Exhibits C through I. Plaintiff reserves the right to supplement this count with additional transactions that may be uncovered through discovery or otherwise.

211. To this date, EHF is unsure as to the extent of the funds removed from EHF by the EHF Defendants through the Auction UVKS.

212. Accordingly, as to equitable accounting, no adequate and expeditious remedy exists at law.

WHEREFORE, the Liquidating Agent respectfully requests that the Court enter judgment against Atkinson and Murphy and in favor of the Liquidating Agent and EHF's Bankruptcy Estate requiring each EHF Defendant to account for all property of or originating with EHF, including, without limitation, property originating from the Auction UVKS, that has come into his or her name, possession, custody, or control and granting such further relief as the Court deems just and appropriate.

## Count XI: Turnover
### 11 U.S.C. §§ 542(a)

The Liquidating Agent sues the EHF Defendants, the Wholesaler Defendants, and the Auction Defendants for turnover of property of the EHF Bankruptcy Estate pursuant to 11 U.S.C. § 542(a) related to the Auction UVKS and in support thereof alleges as follows:

213. The allegations contained in paragraphs 1 through 101 are incorporated into this count as though fully set forth herein.

214. This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A), (E), (H), and (O) and, in the case of Atkinson only, 11 U.S.C. § 157(b)(2)(C).

215.   Upon information and belief, property of EHF improperly came into the possession of each of the EHF Defendants, the Wholesaler Defendants, and the Auction Defendants through the operation of the Auction UVKS.

216.   Each of the EHF Defendants, the Wholesaler Defendants, and the Auction Defendants failed to disclose benefits secretly received from the operation of the Auction UVKS to EHF despite the fact each knew that the origin of such benefits was used vehicles owned by EHF including those identified with specificity in Exhibits C through I.  Plaintiff reserves the right to supplement this count with additional transactions that may be uncovered through discovery or otherwise.

217.   Through the operation of the Auction UVKS, upon information and belief, each of the Defendants has title to, possession of, custody of, or control over property, funds, and their proceeds which originated from EHF and improperly came into the possession of Defendants through the operation of the Auction UVKS and which properly constitute property of the EHF Bankruptcy Estate as defined in § 541(a) of the Bankruptcy Code.

218.   This property is not of inconsequential value or benefit to EHF's Bankruptcy Estate.

219.   None of the Defendants are holding this property as custodians for EHF or its bankruptcy estate.

220.   But for the Defendants' wrongful possession of this property, EHF would be able to use, sell, or lease such property under Bankruptcy Code § 363.

221.   Pursuant to § 542(a) of the Bankruptcy Code, any and all such property of EHF should be turned over for the benefit of EHF's Bankruptcy Estate.

WHEREFORE, the Liquidating Agent respectfully requests that the Court enter judgment against the EHF Defendants, jointly and severally, and in favor of the Liquidating Agent and EHF's Bankruptcy Estate (a) declaring that any property or financial benefit which any Defendant received on account of the Auction UVKS constitutes property of the EHF Bankruptcy Estate; (b) directing that any proceeds or financial benefit derived by any Defendant from the operation of the Auction UVKS (and such additional property accounted for that is property of EHF), or their equivalent value, be turned over to the EHF Bankruptcy Estate pursuant to 11 U.S.C. § 542; (c) awarding the Liquidating Agent all costs and expenses incurred in this action including reasonable attorney's fees; and (d) granting such further relief as the Court deems just and appropriate.

Dated:  December 30, 2011 at Tampa, Florida

Respectfully submitted,


/s/   Hans Christian Beyer
Hans Christian Beyer
Florida Bar No. 894087
**The Law Office of
Hans Christian Beyer, P.A.**
711 South Howard Avenue, Suite 200
Tampa, Florida 33606
Telephone: (813) 251-2028
Facsimile: (813) 944-5182
E-mail: HBeyer@LOHCB.com

**Attorneys for Liquidating Agent**

## VERIFICATION

Geoffrey Todd Hodges, being first duly sworn, hereby states in his capacity as the Corporate Secretary of Ernie Haire Ford, Inc. that he has read the foregoing *Verified Complaint* and that the factual allegations contained therein are true, correct, and complete to the best of his knowledge, information, and belief.

/s/ Geoffrey Todd Hodges
Geoffrey Todd Hodges
Corporate Secretary
Ernie Haire Ford, Inc.


COUNTY OF HILLSBOROUGH
STATE OF FLORIDA


The foregoing signature of Geoffrey Todd Hodges on this *Verified Complaint* was acknowledged before me this 13th day of December, 2011, by Geoffrey Todd Hodges in his capacity as Corporate Secretary for Ernie Haire Ford, Inc. who did take an oath. He is personally known to me.

RHONDA L. HALL
MY COMMISSION # EE 072468
EXPIRES: April 22, 2015
Bonded Thru Notary Public Underwriters

Printed Name: _____
Notary Public
Serial Number (if any):_____
My Commission Expires: _____